UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

SARAH,

Plaintiff,

v.

GOOGLE LLC, YOUTUBE LLC, JAMES JACKSON, also known online as "ONISION," and LUCAS JACKSON, formerly known online as "LAINEYBOT," "LAINEY" and "KAI,"

Defendants.

Case No.: 1:23–cv–00223

HON. HALA Y. JARBOU

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS GOOGLE LLC AND YOUTUBE LLC MOTION TO TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA**

# CONTENTS

TABLE OF AUTHORITIES .......... ii

SUMMARY OF ARGUMENT .......... 1

STATEMENT OF FACTS .......... 2

ARGUMENT .......... 4

I. As a Minor, Sarah had Neither the Experience, Knowledge, nor Skill Level to Assent to Defendants' Forum Selection Clause Contained in their Sign-in Wrap Agreement .......... 4

II. As a Minor Sara Lacked the Capacity to Contract and She did not Ratify or Confirm the Relevant TOS upon Reaching Majority. 8

III. Even if the TOS Forum Selection Clause is Valid, it is not Dispositive .......... 12

CONCLUSION .......... 16

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT .......... 18

# TABLE OF AUTHORITIES

## Cases

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49 (2013) .......... 12, 14

*Berman v. Freedom Financial Network, LLC,* 30 F.4th 849 (2022) .......... 5

*B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931 (2022) .......... 6

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) .......... 15

*Minock v. Shortridge*, 21 Mich. 304 (1870) .......... 9

*Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444 (2021) .......... 4, 6, 7

*Solari v. Goodyear Tire & Rubber Co.*, 654 F. App'x 763 (6th Cir. 2016) .......... 15

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988) .......... 13, 14

*Tyler v. Fleming*, 68 Mich. 185 (1888) .......... 12

*Woodman ex rel. Woodman v. Kera LLC*, 486 Mich. 228 (2010) .......... 8

## Statutes

MCL 722.52 .......... 8

## SUMMARY OF ARGUMENT

The YouTube Defendants have filed a motion to transfer this case to the San Jose Division of the Northern District of California under 28 U.S.C. § 1404(a). In support of their motion, they cite "the parties' governing forum-selection agreement." PageID.513. Plaintiff Sarah's claims concern conduct related to child sex trafficking which occurred from approximately 2014 to 2019. The YouTube Defendants ground their motion on Sarah's creation of YouTube accounts on February 23, 2013, and on February 6, 2015. PageID.515.

YouTube's Terms of Service agreement ("TOS") is unenforceable as to Sarah's claims all of which arose prior to the Summer of 2018 when she turned 18. As a minor, Sarah had neither the experience, knowledge, nor skill level to assent to Defendants' forum selection clause contained in their sign-in wrap agreement.

More importantly, as a minor, Sarah lacked the capacity to contract and she did not ratify or confirm the relevant TOS upon reaching majority as required under longstanding well-established Michigan law.

Finally, even if the Defendants' TOS forum selection clause is valid, it is not dispositive. Depending on whether the Court finds the forum selection clause valid, there are numerous factors which weigh in favor of maintaining this action in the Western District of Michigan.

## STATEMENT OF FACTS

Plaintiff Sarah filed this lawsuit on March 2, 2023, based on facts and circumstances which occurred online and offline in the state of Michigan, as well as for conduct that occurred in the state of Washington. PageID.318-19. Plaintiff was born in the Summer of 2000. In approximately 2012, James Jackson ("Onision") and his spouse Lucas Jackson ("Lainey") (collectively the "Jackson Defendants") began working together to groom and lure underage girls through the Onision YouTube channels and online forums as part of the YouTube Partnership Program. (PageID.26 ¶146–150, PageID.27 ¶156–158). The audience for Onision's channels and forums extended to this District, including to Plaintiff. (PageID.29-30 ¶176–177, PageID.318 ¶2, PageID.7 ¶39). Starting in approximately 2014, when Plaintiff was approximately 14 years old Lainey and Onision groomed Plaintiff for over two years. (PageID.30-36 ¶181–209). On multiple occasions from

2016 to 2019, the Jackson Defendants lured and enticed the then–minor Plaintiff to travel across interstate lines from her home state of Michigan to their home state of Washington for the purpose of grooming and manipulation of Plaintiff while she was still a minor child. (PageID.36 ¶210, 37 ¶220, 40 ¶239, 41 ¶244, 42 ¶254, 43 ¶266, 44 ¶276, 48 ¶¶311, 312, 315; PageID.318 ¶6, PageID.319 ¶7). Lainey eventually obtained guardianship over Plaintiff, which was authorized in this District. (PageID.37 ¶218; PageID.319 ¶9). When Plaintiff finally turned 18, after four years of child sexual abuse and grooming, Onision ultimately raped Plaintiff. (PageID.45-46 ¶¶283–299).

On April 2, 2023, the Jackson Defendants filed a Motion to Dismiss Plaintiff's complaint pursuant to Fed. Civ. P. 12(b)(2), 12(b)(3), and 12(b)(5), as well as an incorporated Motion to Transfer Venue to the Western District of Washigton. (PageID.176). The YouTube Defendants filed an opposition brief to the Jackson Defendant's motion to transfer on April 20, 2023. (PageID.274-281). Plaintiff responded to all motions on May 1, 2023. (PageID.290-317).

On May 19, 2023, the YouTube Defendants filed a Motion to Transfer Plaintiff's case to the Northern District of California pursuant

to 28 U.S.C. § 1404(a) and the forum selection clause in the YouTube Terms of Service ("TOS") Agreement. (PageID.506-507). The YouTube Defendants cite Plaintiff's creation of two YouTube accounts while she was a minor as the basis for this motion.

## ARGUMENT

### I. AS A MINOR, SARAH HAD NEITHER THE EXPERIENCE, KNOWLEDGE, NOR SKILL LEVEL TO ASSENT TO DEFENDANTS' FORUM SELECTION CLAUSE CONTAINED IN THEIR SIGN-IN WRAP AGREEMENT

There are several kinds of terms of service ("TOS") that websites use to notify users of the agreement which governs the platform:

> A "clickwrap" agreement is one in which an internet user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available. A "scrollwrap" agreement is like a "clickwrap," but the user is presented with the entire agreement and must physically scroll to the bottom of it to find the "I agree" or "I accept" button.... "Sign–in–wrap" agreements are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up.

*Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463–64 (2021), *reh'g denied* (Jan. 18, 2022), *review denied* (Apr. 13, 2022). Based on

Defendants' representations, the YouTube TOS is a "sign–in–wrap" agreement. (PageID.560). Courts have outlined that at one end of the spectrum of enforceability lies "browsewrap" agreement, which are usually unenforceable, and "clickwrap" agreements are usually enforceable. *Berman v. Freedom Financial Network, LLC,* 30 F.4th 849, 856 (2022). According to Berman:

> To avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements such as those at issue here have devised rules to determine whether meaningful assent has been given. Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms. *See Meyer*, 868 F.3d at 75; *Nguyen*, 763 F.3d at 1173 (refusing to enforce an arbitration provision to which the consumer "did not unambiguously manifest assent"). As the Second Circuit has explained, "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility."

*Id.*

Very few courts have considered the wide variety of TOS, but the California Court of Appeals has addressed the validity of "sign–in–wrap" agreements on two occasions: in *Sellers* and again in *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931 (2022). In *Sellers*, the court concluded that "[s]ign–in wrap agreements fall somewhere in the middle of the two extremes of browsewrap and scrollwrap agreements." *Sellers*, 73 Cal. App. 5th at 471. As a matter of first impression, the *Sellers* court addressed whether "sign–in wrap" agreements were "sufficiently conspicuous to bind the Plaintiffs to the Arbitration Provision." *Id.* at 477. The *Sellers* court observed that while "sign–in wrap" agreements have been generally upheld by federal courts, there are some inconsistencies in the case law due to the highly subjective criteria that courts consider. *Id.* at 471–72. In determining whether "sign–in wrap" agreements put consumers on sufficient notice, courts have considered: "1) the size of the text; 2) the color of the text as compared to the background it appears against; 3) the location of the text and, specifically, its proximity to any box or button the user must click to continue use of the website; 4) the obviousness of any associated

hyperlink; and 5) whether other elements on the screen clutter or otherwise obscure the textual notice." *Id.* at 473.

One significant factor in this case, where Sarah was a minor when Defendant's allege she agreed to their forum selection clause, is the Court's "subjective views about the experience, knowledge, and skill level of the 'typical' online consumer" (*Id.* at 474) where "it is more appropriate to focus on the providers, which have complete control over the design of their websites and can choose from myriad ways of presenting contractual terms to consumers online" to "eliminate any uncertainty as to the consumer's notice of contractual terms and assent to those very terms." *Id.* at 475–76.

In determining the validity of the sign–in wrap agreement in this case, the Court should consider the five factors outlined in *Sellers*. Unfortunately, Defendants' Exhibit 1 makes this kind of assessment difficult if not impossible. PageID.525-571. The Court may need to conduct additional factfinding to determine just how 14–year–old Sarah was presented with Defendants' sign–in wrap agreement and whether she had the "experience, knowledge, and skill level of the typical online consumer" and whether or not "the provider…eliminate[d] any

uncertainty as to the consumer's notice of contractual terms and assent to those very terms."

## II. AS A MINOR SARA LACKED THE CAPACITY TO CONTRACT AND SHE DID NOT RATIFY OR CONFIRM THE RELEVANT TOS UPON REACHING MAJORITY

Before undertaking the above analysis, however, Sarah's minority is a limiting factor since under longstanding Michigan law she did not have the capacity to agree to Defendants' sign–in wrap agreement. As a Michigan resident, Sarah's minority status is governed by *Woodman ex rel. Woodman v. Kera LLC*, 486 Mich. 228 (2010) which is the most recent Supreme Court of Michigan decision on this issue.

In *Woodman*, unlike this case, a parent executed a waiver on behalf of a child. The Supreme Court of Michigan restated and reaffirmed the "well-established Michigan common law rule…that a minor lacks the capacity to contract." *Id.* at 236. The Court found that "if five–year–old Trent had signed the waiver, defendant could not enforce the waiver against him unless Trent confirmed it after he reached the age of majority." The age of majority in Michigan is 18. MCL 722.52. The *Woodman* court cited with approval the 1870 Supreme Court of Michigan decision on a minor's capacity to consent to

a contract, *Minock v. Shortridge*, 21 Mich. 304 (1870). In *Minock*, the Supreme Court of Michigan held that:

> The executory contract of an infant, such as a promissory note, is not void in the sense of being a nullity, because it may be confirmed, but it has no binding force until it is confirmed. Being executory, and not binding until confirmed, it is said to be voidable….
>
> The general rule is that an executed contract is binding until *avoided* by words or conduct which show that the party refuses longer to be bound by it. But when it is said that the executory contract of an infant is voidable, the idea represented is that the contract is susceptible of confirmation or avoidance by the promisor, though it is not binding until it is ratified.
>
> There can be no ratification without the assent of the person to be charged. And where the liability of the party depends upon his acts done after becoming competent to give a binding assent, **the nature and extent of the liability will depend upon what he assents to, as ascertained from his words or relevant circumstances, and he can be held to no other or different engagement than such as he is found to have assented to**. The case may show a ratification, or, failing to show that, **it may disclose a different and distinct agreement**, involving a liability indeed, but a liability quite unlike and remote from that produced by a ratification. When a ratification occurs it excludes all right to disavow the original undertaking, and makes it obligatory as against the defense of infancy. The new matter reaches back and renders the original contract binding from the time it was made, and the first agreement

> having in its entirety received the assent of the promisor after the ceasing of his disability, is made in all its parts the binding contract of the parties. **The minor, on coming of age, may, however, fail or decline to assent to a confirmation of the first agreement, but may be willing to make himself liable upon a new express or implied undertaking**, based on the original consideration. He may, expressly or by implication, agree to terms which necessarily create a conditional, qualified or restricted liability, and, in such case, the first agreement is not ratified by the second. **A new agreement is constituted which is operative only from the time of its creation, and effective according to its nature**.

*Id*. at 315–16 (emphasis added).

In order to be bound by the YouTube's TOS which existed in 2013 and 2015 when Sarah created her YouTube account, Sarah needed to ratify the TOS in effect on those dates when she became an adult in 2018.

The May 25, 2018 TOS was in effect when Sarah turned 18. The essential question is whether the TOS was a "different and distinct agreement" from the prior TOS," or whether it is a "new express or implied undertaken" which is "operative only from the time of its creation. Sarah "can be held to no other or different engagement than such as [s]he is found to have assented to."

Did the 2018 TOS specifically "reached back" to "render the original contract binding from the time it was made" or did Sarah, "on coming of age… fail or decline to assent to a confirmation of the first agreement, but may be willing to make himself liable upon a new express or implied undertaking, based on the original consideration?"

Although the TOS effective as of May 25, 2018—when Sarah reached majority—and the TOS in effect in 2013 when Sarah was a minor contain the exact forum selection clause (compare PageID.571 and PageID.551), the question remains whether or not Sarah explicitly ratified the prior TOS upon turning 18 or whether the identical boilerplate TOS are sufficient to "reach back" to "render the original contract binding from the time it was made." It is not.

The plain language of the May 25, 2018 TOS does not include any kind of ratification or confirmation clause, no look back language, or anything to demonstrate that Sarah's agreement to the 2018 TOS—if valid in the context of a sign–in wrap agreement—at all indicated her "assent to a confirmation" of the 2013 TOS. According to Michigan law, the burden of proof is upon the Defendants to show that Sarah ratified the TOS after she attained majority. Most importantly, "there must

have been an express promise after [s]he became of age, or such acts as would have been equivalent to a new contract." *Tyler v. Fleming*, 68 Mich. 185, 187 (1888).

The Defendants have not met their burden and shown that Sarah, by an "express promise after she became of age," ratified the TOS in effect while she was a minor and therefore the 2018 TOS was the "equivalent to a new contract."

## III. EVEN IF THE TOS FORUM SELECTION CLAUSE IS VALID, IT IS NOT DISPOSITIVE

According to the Supreme Court, if a forum–selection clause is invalid or not present:

> a district court considering a § 1404(a) motion (or a *forum non conveniens* motion) must evaluate both the convenience of the parties and various public-interest considerations. Ordinarily, the district court would weigh the relevant factors and decide whether, on balance, a transfer would serve "the convenience of parties and witnesses" and otherwise promote "the interest of justice."

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62–63 (2013).

When a valid forum–selection clause is present, it "will be a significant factor that figures centrally in the district court's calculus."

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). Although a forum–selection clause is “significant,”

> the District Court will be called on to address such issues as the convenience of a…forum given the parties’ expressed preference for that venue, and the fairness of transfer in light of the forum–selection clause and the parties’ relative bargaining power.

*Id.* Most importantly, the United States Supreme Court held that:

> The forum–selection clause, which represents the parties’ agreement as to the most proper forum, should receive neither dispositive consideration…nor no consideration…, but rather the consideration for which Congress provided in § 1404(a).

*Id.* at 31.

Given all of the above considerations, the Court must determine if the forum–selection clause in this case is valid, and if it is, “the fairness of the transfer in light of the forum–selection clause and the parties’ relative bargaining power.” This analysis pits a young woman in her early twenties against Defendants Google and YouTube. In terms of “relative bargaining power,” Sarah has almost none and Defendants have extraordinarily sophisticated power as hugely successful multinational corporations with billions of dollars at their disposal. In terms of “fairness,” the same factors apply—requiring a young woman

from rural Michigan to travel to the Northern District of California to litigate her claims against powerful corporations on their home turf hardly seems "fair."

Although the Supreme Court held in *Atl. Marine Const. Co.* that when a valid forum selection clause is present, "a district court may consider arguments about public–interest factors only," it qualified this as "the **parties' agreement** as to the most proper forum," and further, the "enforcement of valid forum–selection clauses, **bargained for by the parties**." *Atl. Marine Const. Co.*, 571 U.S. at 63. Further,

> When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations. A forum–selection clause, after all, **may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms**; it may, in fact, **have been a critical factor in their agreement to do business together in the first place**.

*Id.* at 66. This is clearly not the situation in this case, thus distinguishing *Atl. Marine Const. Co.* from the Supreme Court's earlier decision in *Stewart*.

In the Sixth Circuit,

> Courts consider the following public–interest factors: "administrative difficulties...for courts when litigation is...in

> congested centers instead of...handled at its origin"; the burden of imposing jury duty on a community which has no relation to the litigation; ensuring cases that impact many persons are litigated "in their view and reach..."; the "local interest in having localized controversies decided at home"; and having courts at home with the law decide cases, "rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself."

*Solari v. Goodyear Tire & Rubber Co.*, 654 F. App'x 763, 769 (6th Cir. 2016) citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509–09 (1947).

There are clearly "administrative difficulties" concerning "congested centers" when comparing the Northern District of California and the Western District of Michigan. In 2022, the Northern District of California had 11,268 civil cases pending during the 12–month period ending March 31, 2022. In comparison, the Western District of Michigan had just 1,086 civil cases pending.[1] The median time intervals from filing to disposition of civil cases is also less in the Western District of Michigan (7.8 months) as compared to the Northern District of California (9.4 months).[2]

---

[1] Table C-1—U.S. District Courts–Civil Federal Judicial Caseload Statistics (March 31, 2022) | United States Courts (uscourts.gov).
[2] Table C-5—U.S. District Courts–Civil Federal Judicial Caseload Statistics (March 31, 2022) | United States Courts (uscourts.gov)

In terms of the "local interest in having localized controversies decided at home," the Defendants are global companies with billions of users worldwide. Forcing every plaintiff to travel to the Northern District of California to decide their case is the opposite of having local controversies decided at home. Defendants' Internet platforms like YouTube impact individuals and local communities which bear the brunt of sexualized content aimed at children, online exploitation, and the fallout from sex trafficking. Sarah's injuries are local, not just for her, but for the millions of YouTube users across the globe. It hardly seems fair to require everyone who has been injured by Defendants' products to travel from their localities—which are ably served by a uniform federal district court system—to the federal district court in San Jose, California, to adjudicate their claims and determine their losses, most if not all of which occurred in their local communities.

## CONCLUSION

For all the above reasons, the Defendants' motion to transfer this case to the Northern District of California should be denied.

DATED: June 2, 2023

Respectfully Submitted,

*/s/ James R. Marsh*
James R. Marsh
Margaret E. Mabie
**MARSH LAW FIRM PLLC**
31 Hudson Yards, 11th Floor
New York, New York 10001
Telephone: 212–372–3030
jamesmarsh@marsh.law
margaretmabie@marsh.law

*/s/ Lisa D. Haba*
Lisa D. Haba
THE HABA LAW FIRM, P.A.
1220 Commerce Park Dr.
Suite 207
Longwood, FL 32779
Telephone: (844) 422-2529
lisahaba@habalaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

This document complies with the word limitation of LCivR 7.3(b) because, excluding the parts of the document exempted by LCivR 7.3(b)(i), this document contains 3368 words.

This document has been prepared using Microsoft® Word for Microsoft 365 MSO (Version 2303 Build 16.0.16227.20202) 64–bit which was used to generate the word count.

*/s/ James R. Marsh*
James R. Marsh
**MARSH LAW FIRM PLLC**
31 Hudson Yards, 11th Floor
New York, New York 10001